IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN GRILLONE | : | |
| | : | |
| Plaintiff, | : | |
| vs. | : | C. A. No 2:15-cv-816. |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| CITY OF PHILADELPHIA FIRE | : | |
| DEPARTMENT, LLOYD AYERS, | : | |
| ERNEST F. HARGETT, and | : | |
| WILLIE M. WILLIAMS | : | |
| | : | |
| Defendants. | : | |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Introduction andFactual Statement**

A. Plaintiff's Statement of Facts

This case is about a Fire Battalion Chief, John Grillone, whom the defendants disciplined, humiliated, and deeply saddened, after one of his men posted videos of him on YouTube. The videos showed him having fun with his team and practicing the Star Spangled Banner while he was on duty in the firehouse. For this, he was issued a letter of reprimand; and without explanation was taken out of his command role in the field and placed on extended and meaningless desk duty.

It is also a case about a videotaped testimonial by Commissioner Lloyd Ayers, in which he identifies himself as the Fire Commissioner and promotes the products of Black and Nobel, a

self-identified "black bookstore" that caters almost exclusively to black customers.[1]  He says that

the store is the place he goes for all of his intellectual sources, and that we need to support it

because "that's what it's all about". Commissioner Ayers' testimonial remains posted on

YouTube at: https://www.youtube.com/watch?v=nsJPEzYZF64.

We supply a transcript of it at App. 0001.

Defendants deemed Commissioner Ayers' racially biased video to be of no consequence.

By contrast, they deemed the video of Chief Grillone to be worthy of discipline.

Chief Grillone was a commander who was respected by his men.  He built a team, and

led his firefighters successfully, both on and off the fire field. To be effective, it was important

that he build camaraderie among his men.[2]  Doing so through lighthearted fun was an integral

---

[1] For a fuller description of the bookstore, see interview of the bookstore's owner, Hakim
Hopkins posted on YouTube at https://www.youtube.com/watch?v=7ltPbo4LhsE. We supply a
transcript of the interview at App. 0002-0004).

[2] As H.R. Manager Karen Hyers testified:

> Q.  What's your understanding about why it is that firefighters do
> joke around in the firehouse?
>
> A: Like I said, they have a lot of time on their hands.  They're –
> they get along for the most part.  I guess it builds camaraderie.
>
> Q. Do you think it has anything to do with the fact that they, from
> time to time on a totally unexpected basis, have to face horrible
> emergencies?
>
> A.  Sure.
>
> Q.  Are there any firehouses that have trouble with camaraderie.
> that you know of?
>
> A.  There have been, sure, yes.
>
> Q.  Has there ever been any camaraderie difficulty in Chief
> Grillone's firehouse ?     [f.n. continues on next page]

part of Chief Grillone's management style.[3]   Defendants knew this and commended him for it. As these comments in his performance reviews state:

> "During the past year you have performed your duties as a Battalion Chief in an outstanding manner.  You have led by example and have established clear goals for your subordinates to follow in areas of teamwork, attitude, and enthusiasm. *You have created a congenial, positive working environment conducive to achieving departmental goals.* You have always exhibited a cooperative spirit and positive attitude towards departmental policies effectively facilitating their realization.  The safety of the firefighters under your command is very evident in your fire ground operations.  As always, you have been able to master the job with ease.  Thanks for a job well done." (Edwin J. Grugan, 2009) (emphasis supplied); and
>
> "…Your command is well managed and reflects your confidence and experiences.  Your personal involvement in your battalion contributes to the high morale level and is indicative of your leadership qualities…." (William C. Schweizer, 2010).
>
> (App. 0041-0042)

In 2009, one of the firefighters in Chief Grillone's battalion, Firefighter Charlie Tizol, took some videos on his phone while Chief Grillone and his men were on duty in the firehouse waiting, as they always were, for an alarm that could go off at any moment.  FF Tizol then

---

> A. Not that I can recall.

(App. 0014: Transcript of December 15, 2015 Deposition of H.R. Manager Karen Hyers (hereinafter "Hyers Dep." ) at 35:23-36:13)

[3] App. 0022: Transcript of November 10, 2015 Deposition of John Grillone (hereinafter "Grillone dep.") at p. 34:3-8.  Chief Grillone testified:

> …I had a really good relationship with the guys there and that could take a while as far as camaraderie and training and things like that…..

posted the videos through his personal account on YouTube. (App. 0018: Hyers Dep at 78:7-9). The YouTube videos showed Chief Grillone at work as a manager and team-builder. They were lighthearted, good-natured, and wholesome. In one video, Chief Grillone is practicing the Star Spangled Banner, which he had been asked to sing at the upcoming Hero Thrill Show. In another, Chief Grillone (who often urged his firefighters to lose weight for their health, and who talked freely with them about his own efforts to lose weight) is jokingly suggesting that if he eats only the chocolate chips out of a piece of cake, he can lower his caloric intake. In a third, he finds himself the subject of a gag soda can that causes the contents to dribble down his chin when he takes a drink. There are no physical touchings, no offensive gestures, no insults, no pretending to drink alcohol or take drugs, no scowling or frowning, no signs of hostility, and no arrogance or boasting. The joking profanities are typical vernacular speech – nothing angry or accusing. These videos show how Chief Grillone "created [the] congenial, positive working environment conducive to achieving departmental goals" for which he had been praised.

The videos remained on YouTube for roughly a year. During that time, many people in the Department complimented Chief Grillone on them and let him know that they enjoyed them. (App. 0023: Grillone dep. at 45:2-3). One of those people was his boss, Deputy Chief William Schweitzer, the one who had said on Chief Grillone's 2010 performance review:

> Your personal involvement in your battalion contributes to the
> high morale level and is indicative of your leadership qualities….

When D.C. Schweitzer saw the videos, he told Chief Grillone that he thought they were "really great" and "funny". (App. 0025; Grillone Dep. at 53:11-14). He saw nothing wrong with them.

Yet on February 16, 2011, Special Investigations Officer ("SIO") Willie Williams, and Karen Hyers, a Human Resources Manager, came to Chief Grillone's firehouse for a so-called "investigative interview". SIO Williams and Ms. Hyers stated that their investigation was about

4

a recent complaint concerning the videos, which they claimed had been anonymous, even though they knew that the complaint was Chief Grillone's boss, D.C. Schweitzer. [4]

Defendant Williams and Ms. Hyers played all of the videos (as well as some Jib Jab clips), and recorded the interview. Defendant Williams told Chief Grillone that the posting of the videos on YouTube violated Fire Department directives. He did not specify which ones, but he and Ms. Hyers gave the impression that the matter was very serious. (App. 0025: Grillone Dep. at 53:4-6)

Without reviewing the Fire Department directives, but taking on faith that what Defendant Williams and Ms. Hyers had said was accurate, Chief Grillone immediately wrote a "heartfelt apology" to Commissioner Ayers, and directed FF Tizol to take the videos down. (App. 0025; Grillone Dep. at 52:21-53:12; App. 0043: "Heartfelt Apology"; App. 0024: 49:17-24).

Defendant Ayers did not accept Chief Grillone's apology, nor did he even share it with Defendants Williams or his Deputy Commissioner, Ernest Hargett. (App. 0038: Williams Dep. at 34:19-21; App 0046: Transcript of December 9, 2015 Deposition of Deputy Commissioner Ernest F. Hargett (hereinafter "Hargett Dep.") at 32:21-33:10). Before any charges were issued, Commissioner Ayers removed Chief Grillone from his command position in active firefighting and placed him in a desk job, where he had no one to supervise and nothing to do. (App. 0026-27: Grillone Dep. at 56:56:24-57:7; 58:2-59:5; App. 0046-47: Hargett Dep. at 33:23-34:4), and where he remained for almost ten months. There was no budget or job description for the position. It fulfilled no need for the Fire Department. It was punitive. (App. 0026; Grillone Dep.

---

[4] Defendants knew from the time of the initial complaint that the complainant was D.C. Schweitzer, and that he had asked that they keep his identity confidential. (App. 0035; Transcript of December 2, 2015 Deposition of D.C. Willie Williams (hereinafter: "Williams Dep."), at 18:11-20 and 21:11-13); (App. 0007: Hyers Dep at 7:6-12).

at 57:3-7). It entailed no unit command. (App. 0053-0054: Hargett Dep. at 133:4-134:3). Defendant Williams admitted that he doubted that Chief Grillone wanted the assignment, because most chief officers in the field would be unhappy with such a job. (App. 0039: Williams Dep. at 38:9-18). At some point, Defendant Hargett did assign Chief Grillone the job of creating an electronic officer's toolbox. (App. 0027: Grillone Dep. at 59:3-61:2). Chief Grillone worked hard on it, and submitted a completed product, but no one ever got back to him on it, and to his knowledge, it was never used. (*Ibid*).

Defendant Williams testified that he had no idea why Defendant Ayers took this action. (App. 0038: Williams Dep. at 37:2-5). For all anyone knew, it could have been a routine matter. In their Memorandum, Defendants point out that desk duty assignments are common, and that officers are often required to rotate through them, implying that the Commissioner did not need a reason to assign Chief Grillone to the Fire Administration Building, and that the assignment was therefore not necessarily punitive.

It was manifestly a humiliating slap in the face to Chief Grillone. It sent the message that, in the eyes of the Defendants, Chief Grillone was worthless. This message was compounded by the Defendants' publication of a Chiefs Locator Chart that omitted Chief Grillone's name, even though other staff chiefs were included. (App. 0055: Chief's Locator Chart, with the space noted where Chief Grillone's name had been deleted, and showing as well that Chief Grillone's name had nowhere else been placed. (App. 0031-32: Grillone Dep. at 85:19-87:7). It gave the impression that Chief Grillone did not exist in the Fire Department. (App. 0030: Grillone Dep. at 81:1-7),   Chief Grillone complained about it, but nothing was done. (App. 0048-49: Hargett Dep. at 52:5-54:2)

The SIO's investigation was conspicuously incomplete.  SIO Williams and H.R. Manager Hyers knew that the complainant was Chief Grillone's boss, D.C. Schweitzer, but they did not interview him or discuss the matter further with him.  They never asked whether he took the obvious management step of talking with Chief Grillone before taking the cowardly action of filing an anonymous complaint, nor did they criticize him for failing to do so.  They never asked whether he had seen the video at any time before filing the complaint (App. 0035: Williams Dep.19:1-3; 20:19-23.  App. 0010: Hyers Dep. at 18:13-16).  And because they kept from Chief Grillone that identity of the complainant, never learned from Chief Grillone that D.C. Schweitzer had earlier said that the videos were "really great" and "funny"..

SIO Williams and Ms. Hyers looked at how many people had viewed the videos (App. 0010:  Hyers Dep. at 18:9-20:13), but noted that the only comments that had been posted, or at least the only ones that were memorable, were a few by Charles Tizol himself. (*Ibid.*).  They made no effort to find out how the men in the firehouse felt about Chief Grillone's participation in the fun or what they considered to be the strengths of his management style. (App. 0040: Williams Dep. at 66:22-67:15; App. 0008-9, 11: Hyers Dep. at 10:23-17:17; 23:9-17).  They did not ask the men whether the videos lowered their opinion of Chief Grillone (App. 0008: Hyers Dep. at 11:2-8), whether they respected Chief Grillone, (App. 0009: Hyers Dep. at 17:10-17), whether they liked having Chief Grillone as their Battalion Chief, or whether he was fair (App. 0013: Hyers Dep. at 30:17-31:2).

Having already assigned Chief Grillone to desk duty without explanation, Defendants then issued seven formal charges against him. Three charged "Conduct Unbecoming a Member", three charged "Neglect of Duty", and one charged "Disobedience of Orders".  The charges were to be fleshed out through the presentation of evidence to a three-man Trial Board.  (App. 0056-

57: Trial Board Charges, Bates 0030-0031. (We discuss these charges more fully in the Argument section of this Memorandum, at pages 16-19 below).

The Trial Board hearing took place on July 8, 2011. Defendant Williams, in his capacity as spokesperson for the Defendants, argued that the Trial Board should vote in favor of the Fire Department on all seven charges. Again, SIO Williams kept from the Trial Board the fact that the complainant was Chief Grillone's boss, despite the voiced objections of the Trial Board's chairman, D.C. Grugan. (App. 0028-29: Grillone Dep. at 73:6-74:3) Thus, the Trial Board had no way of knowing that D.C. Schweitzer had already given Chief Grillone a friendly pass on the videos.

After hearing the evidence, the Trial Board voted unanimously in Chief Grillone's favor on two of the seven charges, and two-to-one in Chief Grillone's favor on the remaining five charges. The one dissenting vote on the 2-1 recommendations was the African American member of the Trial Board. Both of the other two members were White. (Defendants' admission to ¶ 45 of Plaintiff's Second Amended Complaint, ECF Documents 11 and 13)

Notwithstanding the exonerating votes of the Trial Board, Defendant Ayers sent Chief Grillone an official letter of reprimand that reiterated the criticisms of the Trial Board Charges, and that was to become part of his personnel record. (App. 0058-59: Letter of Reprimand, Bates 0507-0508.) The letter of reprimand said nothing about the assignment to desk duty.

The letter of reprimand was dated July 27, 2011. At that time, Chief Grillone had already been on desk duty for four months. Despite his repeated requests to return to the firefighting field, Defendants did not place him back on field duty until December 12, 2011, and then only after requiring him to undergo management training and retraining courses. These courses simply reviewed basics on subjects in which Chief Grillone had earned academic degrees. They

were nothing more than "management for dummies" that he had listened to many times before
(App. 0031: Grillone Dep. at 85:9-11.)  After having finally been returned to the field on
December 12, 2011, he was again an active field commander until December of 2013, at which
point he retired.

   B.  Plaintiff's Response to Defendants' Factual Statement

      With one important exception, Plaintiff does not challenge the accuracy of Defendants'
factual statement.  That one exception is Defendants'  paragraphs 13 and 14, in which they
assert that the complaint  to the Special Investigations Office about the videos was anonymous,
and that the office only later learned that it had come from Deputy Chief William Schweitzer.

      This assertion directly contradicts the deposition testimony of SIO Williams, who was the
and Karen Hyers.  According to SIO Williams, the Defendants knew from the time of the initial
complaint that one of the two the complainants was D.C. Schweitzer, in that they received D.C.
Schweitzer's complaint  on the "same morning or the same day" that they received an initial
complaint from an anonymous caller. (App. 0035: Williams Dep., at 18:11-20 and 21:11-13).
D.C. Schweitzer identified himself, but asked that his complaint remain anonymous. (App. 0007:
Hyers Dep. at 7:6-12).  This is an important factual dispute in that D.C. Williams and Ms. Hyers
did not interview D.C. Schweitzer during the investigation, other than to have the brief
conversation during the initial phone call during which D.C. Schweitzer identified the videos.
(App. 0035: Williams Dep. at 18:11-20 and 20:19-23).  Because of this failure to conduct the
obvious follow-up questions as part of the investigation, and because they kept D.C.
Schweitzer's identity secret from Chief Grillone, D.C. Williams and Ms. Hyers failed to learn
that D.C. Schweitzer had seen the videos earlier and had not reprimanded Chief Grillone about
them, and they failed to present this evidence to the Trial Board.

**Argument**

A. Legal Standards - General

1. Summary judgment is rarely appropriate when the issues involve the Defendant's motivation.

Under Rule 56, F.R.Civ.P., the Court shall grant summary judgment to the moving party if the record, when viewed in a light favorable to the non-movant, shows not only that there is no genuine issue of material fact, *but also* that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, even if the facts are not disputed, summary judgment must be denied if competing inferences can be drawn from those facts. *Hunt v. Cromartie*, 526 U.S. 541, 119 S. Ct. 1545 at 1551-52 (1999) (where reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary judgment stage.). Acordingly, summary judgment is rarely appropriate where (as here) the main issue is one of motivation. *U.S. ex rel Cantekin v. University of Pittsburgh*, 192 F. 3d 402, 411 (3d Cir. 1999) (state of mind issues typically should not be decided on summary judgment); *U.S. v. USX Corp.*, 68 F.3d 811, 827 (3d Cir. 1995) (court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issues requires a determination of state of mind).

2. The evidence must be considered in its totality

Because the whole of the evidence can be greater than the sum of its parts, the evidence must be viewed in its totality. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, (2000) ("It therefore follows that, in entertaining a motion for judgment as a matter of law, the

court should review all of the evidence in the record."); *Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir. 1997) ("[I]t is the totality of the evidence that must guide our analysis rather than the strength of each individual argument.")

### 3.  There is nothing inferior about circumstantial evidence

Circumstantial evidence is just as valid as direct evidence in the proof of discrimination. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003) (the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.)  The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Ibid.*, quoting *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508, n. 17 (1957).

### B.  Plaintiff's Evidence Suffices to Show a Prima Facie Case of Adverse Action

#### 1.  Legal Standard Regarding Adverse Action

The facts necessary to establish the *prima facie* vary depending on the particular circumstances of each case. *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802, n. 13 (1973). The district court's inquiry "*should not be constrained.*  Rather, the court can consider circumstantial evidence and draw inferences in favor of the non-moving party in reaching this determination on summary judgment . . ." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283 (3d Cir. 2000).  (Emphasis supplied.)

A transfer alone can constitute an adverse action, even when it involves no loss in title or pay. *Jones v. School District of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999).  In *Jones,* the Third Circuit stated:

11

> Here, Jones [a high school teacher] challenges both administrative transfers and the denial of the physics roster. As a result of the first transfer, he lost his opportunity to teach physics, which clearly was the subject he sought most to teach. After Jones chose to remain at GWHS because of the possibility that he would be awarded the physics roster, he learned that he was passed over for that position. Instead, the administration assigned Jones to teach what he regarded as less desirable science classes.

> Moreover, the transfer from GWHS to Edison landed Jones in a placement which had a reputation of being a "difficult school." Viewing the facts in the light most favorable to Jones, they suffice to demonstrate that Jones was subjected to sufficient adverse employment actions such that his Title VII and PHRA claims should have survived the initial stage of the *McDonnell Douglas* analysis.

*Jones, supra*, 198 F. 3d at 412 (3d Cir. 1999).

### 2. Facts Demonstrating Adverse Action

The evidence, when viewed in its entirety, shows a significant adverse action against Chief Grillone. Refusing to accept or even share with other members of management Chief Grillone's apology, refusing to let the matter drop, keeping secret from him his boss's identity as the complainant, assigning him to meaningless desk duty even before disciplinary charges were issued against him, directing that disciplinary charges be brought against him, declining to inform the Trial Board that D.C. Schweitzer had earlier approved of the videos, declining to adopt the recommendation of the Trial Board that Chief Grillone be exonerated; issuing a letter of reprimand (a form of disciplinary action[5]); leaving his name off of the Chief's Locator Chart without good reason; forcing him to undergo simplistic management training and retraining; and declining to return him to the field for a total of almost 10 months, including five months after the letter of reprimand; together demonstrate an effort by management to make Chief Grillone

---

[5] See Directive #25, POLICY, page 1, Section 1.3 (App. 0060-0080).

irrelevant to the Department, both in fact and in appearance.  It was gratuitously cruel, and it succeeded in making Chief Grillone feel humiliated and hopeless.

Defendants make light of Chief Grillone's chagrin at being assigned to desk duty, arguing that the assignment was of no consequence because it involved no loss of title or pay. But the desk duty assignment was of major consequence.  In duties alone, the difference between commanding firefighters in the field and sitting idly at a desk in the Fire Administration Building is like the difference between night and day.  One look at the following web posting tells the whole story.  This is what it's like to fight fires in the field: http://www.sliptalk.com/amazing-fireman/, and it is even more challenging to command in such a situation.[6]  By contrast, no one needs a web posting to picture the life of someone on desk duty in the Fire Administration Building with no one to boss and nothing to do.  Even Defendant Williams admitted that most chief field officers would be unhappy with such a job, because they would want to stay in the field.  Chief Grillone certainly did not want the desk job, and he asked more than once to be returned to the field.

The assignment was a far more serious adverse action than the one described in *Jones*, above.  It satisfies Chief Grillone's obligation to present his *prima facie* case.

C.  Defendants Failed to Proffer A Legitimate Business Reason for the Desk Duty Assignment

Once the Plaintiff has demonstrated an adverse action, Defendants must articulate a legitimate business reason for taking that action.  This proffer must be made through admissible evidence.  *Texas Department of Community Affairs v. Burdine,* 450 U.S. 258, 254-255 (1981).

Defendants proffer the YouTube videos and Chief Grillone's failure to stop them as their business reason for issuing the letter of reprimand.

---

[6] A printout of this posting is reproduced at App. 0081-87.

But as for the desk duty assignment and its related insults, Defendants articulate no evidentiary justification at all.  They simply take the position that (1) these actions were not "adverse", and (2) the actions must have been taken with the public's interest in mind, given the criticisms in the Trial Board charges and the letter of reprimand.  (See Defendants' Memorandum of law in Support of Their Motion for Summary Judgment, at page 18.)  The letter of reprimand, however, makes no claim that the desk duty assignment was necessary to remedy the criticisms lodged in the charges, nor did Defendants offer any admissible witness testimony to that effect.   In fact, Defendant Williams testified that he had no idea why the Commissioner assigned Chief Grillone to desk duty.[7]

Defendants have therefore failed to satisfy their burden to proffer a legitimate business reason for the ten-month assignment through admissible evidence, and Plaintiff is therefore entitled to judgment on that point.

D.   Plaintiff's Evidence Suffices to Show Pretext and Motive.

1.   Legal Standard Regarding Pretext and Motive

Once the employee has shown evidence sufficient to make out a *prima facie* case, and the employer has proffered its reasons for the adverse action (should the Court deem that the Defendants have done so), the employee may defeat the motion by challenging the employer's proffered reasons as unworthy of credence (pretext), or by showing that discrimination was more likely than not a determinative factor in the outcome (bias or motive), or by some combination of both. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

---

[7] Ms. Hyers testified as to Commissioner Ayers' reasons, but her testimony was without acceptable evidentiary foundation.  (App. 0015-16: Hyers Dep. at 41:18-42:20). There was certainly no admissible foundation for any proffer as to why the desk duty assignment had to last for ten months.

Pretext can be shown with evidence that tends to prove that the employer's proffered reasons were not the true reasons for the adverse action, *Fuentes v. Persksie,* 32 F. 3d 759, 764 (3rd Cir 1994), or were insufficient to justify it. *Tomasso v. Boeing Co.,* 445 F.3d 702, 710-11 (3d Cir. 2006).

Bias or unlawful motive may be shown by evidence of double standards, *Fuentes, supra,* 32 F.3d at 765; *Waldron v. S.L. Indus., Inc.*, 56 F.3d 491, 503 (3d Cir. 1995) (district court erroneously rejected evidence that plaintiff was subjected to double standard in that he was fired for not visiting "key accounts" when such visiting was not required of his younger replacement), or by behavior indicating racial preference management's discriminatory attitude. *Roebuck v. Drexel*, 852 F.2d 715, 773 (3d Cir. 1998).

If the plaintiff's evidence suffices to permit a rational factfinder to conclude that the employer's proffered reasons are pretextual or biased, no further evidence is required to defeat the motion for summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 2109 (2000).

2. Facts Showing that Defendants' Proffered  Reasons are Pretextual and Biased

    a) Defendants' proffered reasons are pretextual in that they are patently insufficient to justify the adverse actions.

A rational factfinder could easily find that Defendants' proffered justification, i.e. the YouTube videos, did not sufficiently justify the adverse action of assigning Chief Grillone to desk duty for almost ten months, along with the other gratuitously insulting actions that accompanied the assignment. One can reasonably infer that Defendants' application of Directive 25 to the conduct in question here was a conscious pretext for an otherwise unjustified punishment.

Primarily, it is important to remember that Defendant Ayers assigned Chief Grillone to desk duty *even before* the Special Investigations Office issued any charges against him and gave no explanation for doing so.  Thus, the main component of the punishment was imposed without any of the standard due process that the Department's policies called for.

Defendants then conducted a seriously deficient investigation.  They did not interview the complainant D.C. Schweitzer about when he saw the videos, nor did they talk with him about his failure to manage the situation as Chief Grillone's boss. They hid D.C. Schweitzer's identity from Chief Grillone, thereby depriving him of the opportunity to explain that his boss had seen the videos earlier and said that he enjoyed them. They made no effort to find out how the men in the firehouse felt about Chief Grillone's participation in the fun, what they considered to be the strengths of his management style, or whether they respected him. They ignored (because Defendant Ayers kept hidden) Chief Grillone's letter of apology. They could have let the matter drop as a result of the investigation, but they instead went ahead and issued charges that went to a hearing before the Trial Board, where they continued to keep D.C. Schweitzer's identity confidential.  Commissioner Ayers then ignored the findings of the Trial Board and issued a letter of reprimand. (App. 0058-59: Bates 0507-0508.)   The videos simply did not justify this disproportionate response.

The Trial Board charges themselves show how unwarranted Defendants' actions were. The charges made the following criticisms:

- The videos could "potentially [undermine] the confidence of citizens in the integrity of Fire Department employees";

- The context of these videos which can best be described as inappropriate horseplay also has the potential for undermining the command structure of the 12th Battalion if not other areas of the Department as well;

- These video tapings, while on duty, were not authorized by the Fire Commissioner nor were they permitted to be posted on a public domain without prior approval; and

- As a Battalion Chief, you are responsible for the enforcement of all rules and regulations of the Fire Department and the City of Philadelphia. As such, you failed to stop the unauthorized use of duty time and the videotaping of members in uniform which was subsequently posted on a public website.

(App. 0056-57: Trial Board Charges, Bates 0030-0031).

In comparison to the kind of conduct that would in fact constitute an offense worthy of discipline,[8] these criticisms were laughable.

The first one (the videos have the potential to undermine the confidence of citizens in the integrity of Fire Department employees) runs counter to the realities of life in the firehouse. The videos present an image of Philadelphia firefighters as likeable men with senses of humor who innocently joke around in the firehouse in their downtime, knowing that at any moment, they could be called upon to risk their lives for the people of Philadelphia. Every member of management must have done the same at some point during his career as a firefighter. (*Cf.* App. 0012: Hyers 28:11-14 ("I'm sure [silliness] happens [in the firehouses] when the battalion chief is there.")).

Nothing in these videos says that these men and their commanding officer are less dedicated than they would be if they were, say, reading pulp novels or playing cell phone games

---

[8] By comparison, the actual listing of "Conduct Unbecoming" violations in Directive 25 describes behaviors that any firefighter or chief would *know* is worthy of reprimand. Gambling on duty, failure to pay debts, drinking or having alcohol on the breath while on duty, failing to report offers of bribes to commit illegal acts, involvement in crimes of moral turpitude, making false statements in Fire Department records, fighting, using one's name to influence the sale of goods without the Commissioner's approval, or appearing before City Council in uniform to present a protest – these are examples of conduct that would without question undermine the public's confidence and belief in the credibility of the members of the Fire Department. (App. 0060: Directive 25, Section 4.1.11:11, Bates 00597-0598)

between times spent studying revisions to the Department's rules.  The conclusion is baseless. Having fun isn't inconsistent with an acute awareness of one's responsibility as a member of the Fire Department. A rational juror could easily infer that Defendants are simply stretching Directive 25 to accomplish another purpose.

Similarly, the second criticism (inappropriate horseplay that also has the potential for undermining the command structure of the 12th Battalion if not other areas of the Department) posits an unrealistically stuffy model of the command structure in a firehouse.  These men are regular guys, not cultured gentlemen. Chief Grillone's job was to "create a congenial, positive working environment, and to maintain a cooperative spirit, high morale, and personal involvement" with them.  His management style in the firehouse allowed and fostered that environment.  And, as his performance reviews acknowledged, it worked.  Far from undermining the command structure of the battalion, Chief Grillone strengthened it by playing his part in an enjoyable diversion from the inherent stress of the firefighter's job.

As for the third criticism ("the video tapes, while on duty, were not authorized by the Fire Commissioner nor were they permitted to be posted on a public domain without prior approval"), a reasonable juror could easily infer that the Defendants are knowingly forcing a square peg into a round hole.  Without explicitly acknowledging so, this criticism refers to a prohibition in Directive 25 against *lending his/her name or photograph in connection with any written or printed article* without first obtaining the written permission of the Commissioner" (emphasis supplied).[9] To a reasonable juror, and to any member of the Fire Department, the phrase "written or printed article" probably means something that is published or distributed to convey information about news or sports, or perhaps opinion, or culture, or humor, or the

---

[9] (App. 0060: Directive 25, Section 1:11, Bates 0598)

attributes of certain products or services.  It certainly does not refer to jokey postings on social media. Even Ms. Hyers agreed that the video was not a written or printed article or advertisement.  (App. 0017: Hyers Dep. at 70:16-23).

Defendants themselves know the difference between a "written or printed article" and a YouTube video.  That's why the Defendants subsequently undertook to develop a separate Social Media Policy, to clearly differentiate between the implications of promulgating one or the other. (App. 0050:  Hargett Dep. at 98:4-12).

And similarly, the comment in this criticism about the lack of prior approval by the Commissioner again presupposes that these videos fall into the category of a "written or printed article" that would require such approval.  One could easily infer that the Defendants knew that this criticism was an implausible stretch of what the Directive was actually aiming to prevent.

The fourth criticism ("as a Battalion Chief, you are responsible for the enforcement of all rules and regulations....you failed to stop the unauthorized use of duty time and the videotaping of members in uniform which was subsequently posted on a public website") is made trivial in light of the Defendants' failure to address D.C. Schweitzer's abdication of his responsibility to tell Chief Grillone to take the videos down.  Chief Grillone's boss, D.C. Schweitzer committed exactly the same "violation" that Chief Grillone did, yet the Department thought that it wasn't important. (App. 0012: Hyers Dep. at 27:4-19)

The letter of reprimand Commissioner Ayers issued after the Trial Board hearing tracks the original Trial Board Charges almost verbatim.  The first criticism in the letter of reprimand ("the videos [do] not portray the officers and members in a positive light") (App. 0058: Letter of Reprimand, D0507) is but a slightly modified statement of the first criticism in the Trial Board

Charges (the videos have the potential to undermine the confidence of citizens in the integrity of Fire Department employees) discussed above.

The letter of reprimand then repeats almost exactly the second, third, and fourth criticisms in the charges discussed above.  It is as though the Trial Board hearing and recommendations had no effect whatsoever on the Commissioner's view of chief Grillone's case.

But probably the most interesting and telling thing about the letter of reprimand is that it makes no reference whatsoever to the months Chief Grillone spent, and was to further spend, on desk duty.  Defendants refuse to even acknowledge the punitive nature of that assignment, arguing that it is not an adverse action at all, and effectively denying that it was caused by the videos.

But in any event, all of this evidence, taken together, could demonstrate to a reasonable juror that it was not the videos alone that motivated Defendants to engage in the adverse actions. Rather, it was a greater and unwarranted purpose to punish and humiliate Chief Grillone, and that Defendants' proffered explanation is not a sufficient reason to treat him the way they did. Should such a juror find Defendants' stated reasons to be pretextual in that regard, he or she would be free to find for Chief Grillone if he felt that those reasons were a pretext for discrimination.

b)  Defendants' actions were the result of racial bias.

There is strong evidence of racial bias that would permit a reasonable juror to find unlawful motive in Defendants' actions against Chief Grillone.  This evidence includes:

- The glaring message of racial bias that is apparent  in the Black and Nobel video, in which Commissioner Ayers pushes the products of a black-oriented store which he exhorts the video's viewers to support.  The fact that Commissioner Ayers "gave

himself permission" to appear in the video is not the issue here.   The issue is the

nature of the product he is endorsing, i.e. books and videos aimed at black customers

from a self-identified black bookstore, which he says supplies "everything he needs",

and that is worthy of support because "that's what it's all about".   This video could

only be seen by the white members of the department as indicative of a general

attitude of racial preference. [10]

---

[10] See, for example, some of the posted comments to the video, including:

Dennis Dougherty 4 years ago
Where's my white book store? Oh, that's right, I would be considered a racist if I wanted
a white book store.



bonfire859 4 years ago
What an assbag! Immoral elitist racist ! Honor, ethics, integrity?Anyone? And then to
DISCIPLINE one of your battalion chiefs for singing the National Anthem? WTF?



Clay Henry 4 years ago
Only support black? I thought his department served all people, regardless of color, race,
religion. Do your promotion in your personal time, without using your city position. WTF



TheDestined7 3 years ago
Wow. Racism in its purest form. Did he get fired after this video was released? I hope so,
especially if he's a commissioner. A lawsuit waiting to happen.



110Chief 4 years ago
shouldnt this be grounds for firing? after all, didnt this admin repremand a Bat. Chief for
singing?

- In a classic case of double standard, Defendants criticized Chief Grillone for "Conduct indicating that a member has little or no regard for his/her responsibility as a member of the Fire Department." Commissioner Ayers' video is far worse than Chief Grillone's in that regard. It is the Commissioner's responsibility to scrupulously maintain both a standard and the appearance racial impartiality. He has no authority to "give himself permission" to publicly and knowingly act inconsistently with that responsibility. Even Defendant Hargett admitted that the Black and Nobel video could be "confusing" to the members of the Department.[11]

Rejecting the "double standard" analysis, SIO Williams, ignored the union's voiced concern on Chief Grillone's behalf about the Black and Nobel video,

---



tulllguy 3 years ago
unflattering piece on him in the new Philly magazine.



master of death 5 years ago
I happend upon this video,while doing research on insurance issues  I guess he never heard MLK speech.(so much for being judged by the content of ones charachter and not by the color of his skin). It seems that if you own any kind of buisness and you are African American then you can expect preferential treatment from the city.(cause you know as he said"thats what its all about") Well, I for one have spent my last penny in philadelphia!! What a sad representative of city management.

[11] Deputy Commissioner Hargett testified [App. 0050: Hargett Dep. at  98:23-99:3] :

    Q. And you don't think that Commissioner Ayers'
    video might confuse people about what's acceptable or
    what's unacceptable [behavior]?

    A. I could see where people might be
    confused.

dismissively calling it a case of "apples and oranges".[12]  He even declined to view the

Black and Nobel video, thereby lending an air of racial arrogance to the way the

Department was handling the investigation (*id.*);

---

[12] D.C. Williams testified: [App. 0036-37: Williams Dep. at 25:2- 26:7]

> Q. Are you aware that at some point a video
> appeared on the internet of Commissioner Ayers talking about a bookstore
> called Black and Nobel?
>
> A. That was brought up by one of the union
> reps on the -- during the interview.
>
> Q. During the interview with Chief Grillone?
>
> A. Yes.
>
> Q. And have you ever seen that?
>
> A. No, I haven't.
>
> Q. Have you ever thought about looking at it?
>
> A. Not particularly.
>
> Q. What did the union rep say about it, if you
> recall?
>
> A. Not verbatim, but said that basically he
> alleges that that was inappropriate as well.
>
> Q. Why did you not look at it?
>
> A. I don't recall at the time why I didn't look at it.
>
> Q. Did you ever talk to Commissioner Ayers about
> it?
>
> A.  He may have mentioned it to me, but I
> didn't go in to follow up with him about it.
>
> Q. Do you remember what, if anything, he said to
> you about it?

- Commissioner Ayers bolstered his message of racial bias by accepting the 'advice" of the dissenting vote at Chief Grillone's Trial Board, that being the vote of the one African American member, and ignoring the findings of the two white members of the Trial Board;

- Similarly, Defendants have responded cavalierly to the concerns raised by the Berkshire Advisers, Inc., consultants to the Pennsylvania Intergovernmental Cooperation Authority, in its "Efficiency and Effectiveness Study of the Philadelphia Fire Department". The Berkshire Advisers state:

> "When survey results are broken out by racial groups, stark differences emerge - 87.2 percent of Caucasians expressing an opinion disagree or strongly disagree that 'disciplinary decisions are made without regard to race or ethnic background,' 64.2 percent of Hispanics disagree or strongly disagree with this statement, but only 29.0 percent of African-Americans disagree or strongly disagree."

> (App. 0088: Hargett Deposition Exhibit 7)

A. Not particularly. But basically the union was reaching, my words, comparing apples to oranges, so to speak, not his.

Q. Did he explain to you why he thought this was an apples to oranges comparison?

A. Not that I recall.

(D.C. Williams later testified that it was he, not Commissioner Ayers, who considered the comparison to be "apples to oranges")

24

Defendant Hargett expressed no concern about this statement, and even refused even to acknowledge what the report stated, declaring that the data were the results of a "flawed process" because they were drawn from a survey that anyone in the Department could participate in. (App. 0051-52: Hargett Dep. at 109:8-111:4). But again, the Defendants' position misses the point. The issue here is that the white firefighters are demoralized, and the Defendants' message is that they simply don't care.

- A double standard is also apparent when one compares the Grillone YouTube video to the self-posted video of African-American Firefighter Shebaka Kenyatta, in which he shamelessly promotes his own music in rap-style format while in uniform in the firehouse. Plaintiff will supply a copy of this video to the Court on a CD.[13] A transcript of it is included at App. 0094. In the case of Firefighter Kenyatta's video, the Defendants apparently started no investigation, issued no charges, and imposed no discipline.[14] Yet the Kenyatta video is far more worthy of discipline than the video in Chief Grillone's case.

---

[13] Our letter to the Court enclosing the CD is reproduced at App. 0096.

[14] In response to Plaintiff's document request for production of the disciplinary file for Firefighter Kenyatta's case, Defendants responded that there is no such file, because no discipline was imposed. See email from Duncan Lloyd to Alice W. Ballard, App. 0095.

In light of all of this evidence, taken as a whole, a reasonable jury could easily infer that the Defendants' proffered reason for the adverse action – i.e. the YouTube videos -- was the result of racial bias aimed at making an example Chief Grillone.  The example sent a clear message that unfair discipline could be capriciously imposed on a white commanding officer, by an African-American administration that felt arrogantly free to express its racial preference in public.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Respectfully submitted,

By: _____
ALICE W. BALLARD, ESQUIRE
Law Office of Alice W. Ballard, P.C.
Identification No: 20633
123 South Broad Street, Suite 2135
Philadelphia, PA  19103
Email:  awballard@awballard.com
(215) 893-9708
(215) 893 9997 (facsimile)